1  RICHARD D. McCUNE (State Bar No. 132124)
   rdm@mccunewright.com
2  DAVID C. WRIGHT (State Bar No. 177468)
   dcw@mccunewright.com
3  JAE (EDDIE) K. KIM (State Bar No. 236805)
   jkk@mccunewright.com
4  McCUNEWRIGHT LLP
   2068 Orange Tree Lane, Suite 216
5  Redlands, California  92374
   Telephone:  (909) 557-1250
6  Facsimile:  (909) 557-1275

7  CHIMICLES & TIKELLIS LLP
   Joseph G. Sauder, (#03079-1998)*
8  Email:  JGS@chimicles.com
   Matthew D. Schelkopf, (#03036-2002)*
9  Email:  MDS@chimicles.com
   361 West Lancaster Avenue
10 Haverford, PA 19041
   Telephone: (610) 642-8500
11 Facsimile: (610) 649-3633

12 Attorneys for Plaintiff Todd Mitsuda and the Putative Class

13 *Pro Hac Vice Applications to be Submitted

14

15            UNITED STATES DISTRICT COURT

16        FOR THE CENTRAL DISTRICT OF CALIFORNIA

17

| | |
|---|---|
| 18  TODD MITSUDA, on behalf of himself and all others similarly situated, | Case No.:  2:15-cv-07375 |
| 20                    Plaintiff, | **CLASS ACTION COMPLAINT** |
| 21          v. | **1. FRAUD BY CONCEALMENT** |
| 22  VOLKSWAGEN GROUP OF AMERICA, INC.; VOLKSWAGEN OF AMERICA, INC., VOLKSWAGEN AG; and DOES 1 through 10, inclusive, | **2. VIOLATION OF MAGNUSON-MOSS WARRANTY ACT (15 U.S.C. § 2301, *et seq.*)** |
| 25                    Defendants. | **3. VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW (California Business & Professions Code §§ 17200, *et seq.*)** |
| 27 | **4. VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW (California Business & Professions Code §§ 17500, *et seq.*)** |

-1-

Class Action Complaint
Case No.:

5. **VIOLATION OF CALIFORNIA CONSUMER LEGAL REMEDIES ACT (Civil Code § 1750 *et seq.*)**

6. **BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (California Commercial Code § 2314)**

7. **BREACH OF CONTRACT / COVENANT OF GOOD FAITH AND FAIR DEALING (Based on California Law)**

8. **NEGLIGENT MISREPRESENTATION (Based on California Law)**

9. **VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF EXPRESS WARRANTIES (California Civil Code §§ 1791.2 and 1973.2(D))**

10. **VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (California Civil Code §§ 1791.1 and 1792)**

11. **DECEIT (California Civil Code § 1710)**

**DEMAND FOR JURY TRIAL**

Class Action Complaint
Case No.:

1

**TABLE OF CONTENTS**

2  I    OVERVIEW ................................................................................. 3

3  II   JURISDICTION AND VENUE .................................................... 6

4  III  PARTIES ..................................................................................... 7

5       A.   Plaintiff ........................................................................... 7

6       B.   Defendants ...................................................................... 7

7  IV  FACTUAL ALLEGATIONS ....................................................... 9

8       A.   The EPA and CARB Implementation of Higher Emissions Standards

9            in 2009 ............................................................................ 9

10      B.   Defendants' Development of the TDI Clean Diesel Technology ................ 11

11      C.   Defendants' Marketing of the TDI Clean Diesel Technology .................... 14

12      D.   The International Council for Clean Transportation/University of

13           West Virginia Study .................................................... 19

14      E.   The EPA and CARB Investigations ............................ 20

15      F.   VW Group of America's Stunning Admission ............. 21

16      G.   Plaintiff's Lease of a 2013 Jetta 2.0L TDI Clean Diesel ............. 23

17      H.   Defendants' Express Warranties ................................. 25

18 V   TOLLING OF THE STATUTE OF LIMITATIONS ................... 27

19 VI  CLASS ACTION ALLEGATIONS ........................................... 27

20 VII VIOLATIONS ALLEGED ........................................................ 32

21      FIRST CAUSE OF ACTION: FRAUD BY CONCEALMENT ........... 33

22      SECOND CAUSE OF ACTION: VIOLATION OF MAGNUSON-MOSS

23           WARRANTY ACT ...................................................... 36

24      THIRD CAUSE OF ACTION: VIOLATION OF CALIFORNIA UNFAIR

25           COMPETITION LAW ................................................ 38

26      FOURTH CAUSE OF ACTION: VIOLATION OF CALIFORNIA FALSE

27           ADVERTISING LAW ............................................... 40

28

Class Action Complaint
Case No.:

FIFTH CAUSE OF ACTION: VIOLATION OF CALIFORNIA
CONSUMER LEGAL REMEDIES ACT ....................................................42
SIXTH CAUSE OF ACTION: BREACH OF THE IMPLIED WARRANTY
OF MERCHANTABILITY ........................................................................44
SEVENTH CAUSE OF ACTION: BREACH OF CONTRACT/COMMON
LAW WARRANTY....................................................................................45
EIGHTH CAUSE OF ACTION: NEGLIGENT MISREPRESENTATION..........46
NINTH CAUSE OF ACTION: VIOLATION OF SONG-BEVERLY
CONSUMER WARRANTY ACT FOR BREACH OF EXPRESS
WARRANTIES ..........................................................................................47
TENTH CAUSE OF ACTION: VIOLATION OF SONG-BEVERLY
CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY ..................................................49
ELEVENTH CAUSE OF ACTION: DECEIT..........................................................51
PRAYER FOR RELIEF ..........................................................................................51
DEMAND FOR JURY TRIAL ...............................................................................51

Class Action Complaint
Case No.:

Plaintiff Todd Mitsuda, on behalf of himself and on behalf of all others similarly situated (*i.e.*, the members of the Plaintiff Classes described and defined within this Class Action Complaint), herein alleges as follows:

# I

## OVERVIEW

1.      This case addresses nothing less than one of the most deliberate and blatant frauds to be perpetrated on the marketplace and on a sovereignty by an international automotive conglomerate in history.  It arises from Defendant VW Group of America's stunning September 3, 2015, admission that, for more than seven years, it had been intentionally, deliberately, and maliciously designing, manufacturing, and distributing hundreds of thousands of its purportedly "clean diesel" with a software algorithm embedded in the engine control module, the sole purpose of which was to detect when a federally mandated emissions test was being conducted and to cause the vehicles' emissions system to switch to an operating mode that would enable the vehicle to appear to pass the federal and state clean air emissions standards.  To be clear, the engine control module would command the emissions system to run in this mode ONLY when the engine control module determined that the vehicle was being operated under the testing conditions for the federally mandated emissions testing.  At all other time times, the engine control module would command the emissions system to operate in such a way that the clean diesel vehicles would, in fact, emit up to 40 times the quantity of nitrogen oxides allowed for by federal and state emissions standards.  In so doing, Defendants have introduced half a million automobiles into the United States market that flagrantly violate this country's Clean Air Act.

2.      The aim of the Clean Air Act and the corresponding regulations and state laws was to protect human health and the environment by reducing emissions of nitrogen oxides and other pollutants.  Nitrogen oxides are known to be a family of highly reactive gases that are significantly involved in atmospheric reactions with volatile organic compounds that produce ozone.  Breathing ozone has been linked to a variety of health

1    problems including chest pain, coughing, throat irritation, and congestion, and can

2    worsen health conditions such as bronchitis, emphysema, and asthma.  What is worse,

3    children are at the greatest risk of experiencing negative health conditions from exposure

4    to ozone.

5            3.      The impunity, avarice, and disregard for the law with which Defendants

6    Volkswagen AG, Volkswagen Group of America, Inc., and Volkswagen of America,

7    Inc., executed this scheme makes this story all the more remarkable.  Since its

8    introduction in 2008, Defendants touted the 2.0L TDI Clean Diesel engine as a "fantastic

9    power train" that "gives very good fuel economy" that "is also good for the environment

10   because it puts 25% less greenhouse gas emissions than what a gasoline engine

11   would, . . . cuts out the particulate emissions by 90% and the emissions of nitrous oxide

12   are cut by 95%, . . . [and is] clean enough to be certified in all 50 states."  (Statement of

13   Volkswagen Group of America, Inc.'s Chief Operating Officer Mark Barnes, to The

14   Business Insider, October 9, 2009.)  What Mr. Barnes neglected to say was that the VW

15   clean diesel vehicles were engineered to be able to detect when they were being tested

16   and to switch the manner in which the emissions system operated to be able to achieve

17   those reductions in nitrogen oxides.  What Mr. Barnes also neglected to disclose was that,

18   after circumventing the emissions laws of the United States, every one of VW's clean

19   diesel vehicles' emissions systems were programmed to run in a mode that would result

20   in up to 40 times the allowable quantities of nitrogen oxides being released into the

21   atmosphere under normal every day operating conditions.

22           4.      Defendants used this fraud to allow them to position VW as the market

23   leader in automotive diesel sales in the United States, capturing 78% of the market by

24   2013 according to its own documents.  And while it was perpetrating this fraud, it was

25   taking shots at other automakers who were caught inflating the real-world mileage

26   performance, as reflected in the statements of Volkswagen Group of America's technical

27   strategy manager, Doug Skorupski, who, in a September 14, 2013 press release, stated

28   that "Volkswagen's sales of TDI clean-diesel models may be benefitting from the

Class Action Complaint
Case No.:

increasing problems that other auto brands have encountered in elevating the real-world mileage performance of some of their cars with the fuel economy they advertise."

5. But perhaps the most brazen display of guile had to be Volkswagen Group of America's press release of August 23, 2013, titled "Volkswagen Group Presses for 'Green' Recognition for Clean Diesel," in which its vice president for industry and government relations complained that "We're not feeling the love," referring to the fact that diesel buyers had not been afforded favorable government treatment, and touting clean diesel as "one of the greatest choices" for car buyers with environmental concerns as well as fuel economy demands.

6. Further evidencing Defendants' commitment to their fraud, even when the first indication surfaced that Defendants' clean diesel cars were violating clean air emissions standards under real-world operating conditions in May 2014, and the EPA and CARB launched their investigations, Defendants vehemently denied any wrongdoing, manufactured "technical issues" to throw investigators off the trail, and even purported to develop a fix and announced a voluntary recall in December 2014 that it claimed would remedy the irregularities identified by the regulators.

7. When federal and state regulators identified the purported voluntary recall as what it was, a sham fix, and threatened to withhold Certificates of Conformity for all future VW diesel automobiles, only then did Volkswagen Group of America finally admit that, since the 2009 model year, it had been engineering its vehicles to be able to identify and circumvent federally mandated emissions testing. This from the company that on January 12, 2008 – immediately prior to the introduction of its 2.0L TDI clean diesel engine – issued the "Volkswagen Group Environmental Principles Products" in which the Chairman of the Board defined the corporate objective of "climate protection" and "reduc[tion of] greenhouse gas emissions." This from the company whose Audi

//

//

//

Class Action Complaint
Case No.:

brand's slogan since 2007 has been:



8.   As the following will set forth, Defendants have perpetrated this fraud on consumers, on federal and state regulators, on the marketplace, but most to the point of this litigation, on Plaintiff Todd Mitsuda and on the Class Members he seeks to represent, each of whom has purchased or leased a VW or Audi vehicle equipped with a 2.0L TDI Clean Diesel engine.  Through this action, Plaintiff seeks to hold Defendants accountable.

## II

## JURISDICTION AND VENUE

9.   This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000 and Plaintiff and other putative class members are citizens of a different state than Defendants.

10.   This Court has personal jurisdiction over Plaintiff because Plaintiff resides in Los Angeles County, California, and submits to the Court's jurisdiction.  This Court has personal jurisdiction over Defendants because Defendants have conducted and continue to conduct substantial business in the District; Defendant VW America's Test Center is located in Ventura County, California, its Design Center is located in Los Angeles County, California, its Western Regional Headquarters is located in Los Angeles County, California, and its Parts Distribution Center is located in San Bernardino County, California; and because Defendants have committed the acts and omissions complained of herein in the District, including the marketing and leasing of a 2013 VW Jetta TDI clean diesel vehicle to Plaintiff in the District.

Class Action Complaint
Case No.:

11.     Venue as to Defendants is proper in this judicial district under 28 U.S.C § 1391 because Defendants sell a substantial amount of automobiles in this District, have dealerships in this District, maintain and operate a Test Center, Design Center, Western Regional Headquarters, and Parts Distribution Center within this District, and many of Defendants' acts complained of herein occurred within this District, including the marketing and leasing of a 2013 VW Jetta TDI clean diesel vehicle to Plaintiff in the District.

**III**

**PARTIES**

**A.    Plaintiff**

12.     Plaintiff Todd Mitsuda is a resident and citizen of Los Angeles, California. Plaintiff is the lessee of a 2013 VW Jetta that he leased on November 30, 2013, from Moss Bros Volkswagen, located in Moreno Valley, California.

**B.    Defendants**

13.     Defendants are automobile design, manufacturing, distribution, and/or service corporations doing business within the United States.  Furthermore, Defendants design, develop, manufacture, distribute, market, sell, lease, warrant, service, and repair passenger vehicles, including the Class Vehicles.

14.     Defendant Volkswagen Aktiengesellschaft, doing business as Volkswagen Group and/or Volkswagen AG (hereinafter, "VW AG"), is a corporation organized and existing under the laws of Germany, with its principal place of business located in Wolfsburg, Germany.  VW AG is the parent corporation of Volkswagen Group of America, Inc.

15.     Based on information and belief, Defendant Volkswagen Group of America, Inc., is a corporation which is incorporated in the state of New Jersey, with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia. Defendant Volkswagen Group of America, Inc., owns and operates the Test Center California ("TCC"), located in Oxnard, California.  According to Defendant Volkswagen

Group of America's 2013 Corporate Social Responsibility Report: "As the largest technical center of its kind for the Volkswagen Group outside of Germany, the TCC plays a pivotal role in the product development food chain, acting as the final stop for many products before they are approved for production.  Work at the TCC is focused on powertrain product development, governmental compliance and field quality testing.  The TCC has more than 50 engineers and technology experts working in a 65,500-square-foot LEED-certified facility."  Based on this, Plaintiff believes that many of Defendants' acts complained of herein occurred within this District.

16.     Based on information and belief, Defendant Volkswagen of America, Inc., is a corporation which is incorporated in the state of New Jersey, with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia, and is an operating unit of Volkswagen Group of America, Inc.

17.     The true names and capacities of Defendants sued herein as DOES 1 through 10, inclusive, are currently unknown to Plaintiff, who therefore sue such Defendants by such fictitious names.  Each of the Defendants designated herein as a DOE is legally responsible in some manner for the unlawful acts referred to herein.  Plaintiff will seek leave of Court to amend this Complaint to reflect the true names and capacities of the Defendants designated herein as DOES when such identities become known.

18.     Based upon information and belief, Plaintiff alleges that at all times mentioned herein, each and every Defendant was acting as an agent and/or employee of each of the other Defendants, and at all times mentioned was acting within the course and scope of said agency and/or employment with the full knowledge, permission, and consent of each of the other Defendants.  In addition, each of the acts and/or omissions of each Defendant alleged herein were made known to, and ratified by, each of the other Defendants.

//

//

//

Class Action Complaint
Case No.:

## IV

## FACTUAL ALLEGATIONS

**A.    The EPA and CARB Implementation of Higher Emissions Standards in 2009**

19.    In the United States, emissions standard are managed on a national level by the Environmental Protection Agency ("EPA"), while state and local governments may apply for waivers to enact stricter regulation.

20.    Two tiers of emissions standards were defined by the Clean Air Act Amendments of 1990.  The Tier I standard was adopted in 1991 and phased in from 1994 to 1997.  The Tier II standards were phased in from 2004 to 2009.  Within the Tier II standard, there are subgroups designated Bins 1-11, with Bin 1 being the cleanest (i.e. zero emission vehicles) and Bin 11 being the dirtiest.  Bin 5 sets forth the standards that apply to automobiles and light trucks.

21.    The Tier II, Bin 5 standards specifically restrict emissions of carbon monoxide ("CO"), nitrogen oxides (NOx), particulate matter (PM), formaldehyde (HCHO), and non-methane organic gases (NMOG) or non-methane hydrocarbons (NMHC).  The emissions limits are defined in the unit grams per mile (g/mi).

22.    Moreover the EPA has developed consumer ratings in the form of an "air pollution score" reflecting the amount of health-damaging and smog-forming airborne pollutants the vehicle emits from zero (most/worst) to 10 (least/best), and a "greenhouse gas score" reflecting the amount of greenhouse gases a vehicle will produce over its lifetime, based on typical consumer usage, from zero (most/worst) to ten (least/best).

23.    One of the factors considered in determining the air pollution score is the amount of nitrogen oxides emitted from the vehicle.

24.    One of the factors considered in determining the greenhouse gas score is the amount of nitrous oxide ($N_2O$) emissions from the vehicle.

25.    California has been granted a waiver from the EPA emissions standards and the California Air Resources Board ("CARB") has adopted stricter emissions standards through California's Low Emissions Vehicle ("LEV") program, defining six automotive

emission standards which are stricter than the EPA's Tier regulations.  A number of states have adopted California's stricter emissions standards, including: Arizona, Connecticut, Maine, Maryland, Massachusetts, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington, as well as the District of Columbia (collectively, the "CARB states").

26.     Under the Clean Air Act, the EPA administers a certification program to ensure that every vehicle introduced into United States commerce satisfies the applicable emission standards.  Under this program, the EPA issues certificates of conformity ("COC") approving the introduction of vehicles into United States commerce.

27.     To obtain a COC, vehicle manufacturers must submit a COC application to the EPA for each test group of vehicles that it intends to enter into United States commerce.  The COC application must include, among other things, a list of all auxiliary emission control devices ("AECDs") installed on the vehicle.  40 C.F.R. § 86.1844-01(d)(11).  An AECD is "any element of design which senses temperature, vehicle speed, engine RPM, transmission gear, manifold vacuum, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system."  40 C.F.R. § 86.1803-01.  If an AECD is included in any vehicle, the COC application must also include "a justification for each AECD, the parameters they sense and control, a detailed justification of each AECD that results in a reduction in effectiveness of the emission control system, and [a] rationale for why it is not a defeat device."  40 C.F.R. § 86.1844-01(d)(11).

28.     A defeat device is an AECD "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use, unless: 1) Such conditions are substantially included in the Federal emission test procedure; 2) The need for the AECD is justified in terms of protecting the vehicle against damage or accident; and 3) The AECD does not go beyond the requirements of engine starting; or 4) The AECD applies only for emergency vehicles . . . ."  40 C.F.R. § 86.1803-01.

29.     Motor vehicles equipped with defeat devices cannot be certified to be in compliance with EPA regulations.  EPA, *Advisory Circular Number 24: Prohibition on use of Emission Control Defeat Device* (Dec. 11, 1972); *see also* 40 C.F.R. §§ 86.1809-01, 86-1809-10, 86-1809-12.

30.     Finally, "[v]ehicles are covered by a certificate of conformity only if they are in all material respects as described in the manufacturer's application for certification."  40 C.F.R. § 86-1848-10(c)(6).

**B.     Defendants' Development of the TDI Clean Diesel Technology**

31.     It was against the backdrop of the phase-in of the EPA's Tier II, Bin 5 standards and CARB's LEV program that in or about 2008, Defendants introduced the 2.0L TDI CR Engine, which they described as "the first of a new generation of dynamic and efficient diesel engines from Volkswagen."  "TDI" stands for "Turbocharged Direct Injected," referring to the fact that these engines are turbocharged and use fuel injectors to directly inject fuel into each cylinder.  Fuel injectors atomize fuel through a small nozzle under high pressure.  "CR" stands for the term "Common Rail," referring to the shared fuel high-pressure accumulator for all injectors in a cylinder bank.



-11-

32.     According to Defendants, "[t]he superior qualities of the 2.0 Liter TDI engine with common rail injection systems are oriented towards future challenges in acoustics, comfort, and exhaust gas after-treatment . . . confirming Volkswagen's role as a pioneer in diesel technology."

33.     Defendants further touted that "[t]he engine offers the potential for future improvements in exhaust gas standards and the associated technologies" and that "equipped with a special after-treatment system, this engine meets current emissions standards." This special after-treatment system consisted of components including a diesel particulate filter with upstream oxidation catalyst and low and high pressure Exhaust Gas Recirculation ("EGR") system to reduce nitrous oxide emissions.

34.     According to Defendants, "[t]he most effective measure to reduce nitrous oxides (NOx) with an internal combustion engine is by introducing very high exhaust gas recirculation rates into the combustion chamber."

35.     Defendants claimed that in order to meet Bin 5 emission standards, "the entire operating characteristics of the engine up to full-load required EGR operation."

36.     Defendants claimed that the "short path of the High-Pressure EGR is used in order to reach the desired EGR rate while driving at lower engine speeds and loads," but that "[w]ith rising engine load and engine RPM, the recirculation of exhaust gases is shifted to the Low Pressure EGR system to increase the recirculation rate . . . in order to obtain optimal NOx reduction at middle and high engine loads."



Class Action Complaint
Case No.:

37.     The exhaust system of the 2.0L TDI CR engine consists of the following main components: 1) oxidation catalytic converter; 2) particulate filter; 3) nitrogen oxide filter; and 4) $H_2S$ catalytic converter.



38.     The oxidation catalyst is designed to convert a large portion of the hydrocarbons and carbon monoxide produced in the combustion process into water vapor and carbon dioxide.

39.     The diesel particulate filter consists of a honeycomb-shaped ceramic body made of aluminum titanide.  As the soot-containing exhaust gas flows through the porous filter walls of the inlet channels, the soot particles are captured in the inlet channels and then later burned off (oxidized) during regeneration cycles.

40.     According to Defendants, a NOx storage catalyst is used to supplement the particulate filter system in order to meet the Tier II, Bin 5 emissions requirements.

41.     At the time of its introduction, the 2.0L TDI Clean Diesel utilized a Lean-NOx Trap technology (hereinafter referred to as "Gen 1").  Defendants later replaced the Gen 1 system with a Selective Catalytic Reduction ("SCR") technology (hereinafter referred to as "Gen 2").

42.     In August 2013, Defendants announced the introduction of the EA288 engine that would eventually replace the 2.0L TDI Clean Diesel.  Defendants claimed that a "number of changes have been made to help reduce emissions, such as: use of a complex exhaust gas recirculation system (with high pressure EGR and a cooled low-pressure EGR); integration of the water-cooled intercooler and the EGR valve with the intake manifold, which also improves throttle response; and packaging the exhaust after-treatment components close to the engine by combining the DPF with the SCR Catalyst" (hereinafter referred to as "Gen 3").

**C.     Defendants' Marketing of the TDI Clean Diesel Technology**

43.     Beginning with the 2009 model year, Defendants began an aggressive marketing strategy to increase its market share of diesel powered vehicles in the United States by touting its "clean diesel" line of vehicles.

44.     In an October 2009 interview with Business Insider, when asked "[w]hat is the advantage of a diesel over a hybrid," VW of America's chief operating officer, Mark Barnes, stated:

> It's also good for the environment because it puts out 25% less greenhouse gas emissions than what a gasoline engine would. **And thanks to the uniqueness of the TDI motor, it cuts out the particulate emissions by 90% and the emissions of nitrous oxide are cut by 95%. So, a very very clean running engine. Clean enough to be certified in all 50 states.**

Gayathri Vaidyanathan, "Volkswagen Preps for a Diesel Revolution," The Business Insider, Oct. 2009 (emphasis added).

45.     In that same interview, when asked "how do you re-brand something that's dirty like diesel as something that's green," Barnes stated:

> The way we've gone about it is through a number of communication pieces. One of them we've used is TDI Truth & Dare. It is a very good website that compares some older

1   diesels versus the current TDI clean diesel. And one of the
2   things we do is we put coffee filters over the exhaust pipes of
3   both cars. We let them run for five minutes and after they are
4   done, we take them off and the older diesel product (not a VW
5   diesel) has a round sooty spot on that coffee filter. Ours is very
6   clean. In fact they actually make coffee out of the filter that was
7   attached to the Volkswagen clean diesel tail pipe and they drink
8   it.

9   *Id.*

10      46.    In an extremely effective effort to boost sales of its line of diesel vehicles,
11   Defendants implemented aggressive national marketing campaigns to raise consumer
12   awareness of what it purported to be its "TDI Clean Diesel Technology."  One example
13   of such marketing efforts was the following print advertisement:



26      47.    In another widely seen video advertisement aired by Defendants, three
27   elderly ladies argue about whether diesel is dirty.
28   //

1
2
3
4
5
6
7
8
9



10      48.     After some bickering, one of the women puts her white scarf up against the

11 exhaust pipe and then holds it up to face, proving that diesel is clean.

12
13
14
15
16
17
18
19



20
21
22
23
24
25
26
27
28



Class Action Complaint
Case No.:



49.     Defendants' also emphasized the fuel efficiency of the TDI Clean Diesel along with its cleanliness.  For example, in a marketing brochure for the 2013 VW Jetta TDI Clean Diesel, Defendants not only claimed that the car had a greater range on a single tank of gas than did the Toyota Prius, Mazda 3, Honda Civic HF, Ford Focus SE, and Toyota Corolla S, but they also claimed that it was "90% cleaner than previous diesel engines."



Class Action Complaint
Case No.:

50.     Defendants' also marketed the TDI Clean Diesel as "typically hav[ing] a higher resale value versus comparable gasoline vehicles," as it did in this 2015 Audi sales brochure:



51.     Defendants' Clean Diesel marketing campaign was, by all accounts spectacularly successful.  Defendants' sales of TDI Clean Diesel vehicles rose from just 12,000 units in North America in 2008, to more than 100,000 units in 2013, constituting a 78% share of the North American diesel automobile market, selling more diesel cars in the United States than every other brand combined.

-18-

Screenshot via VW

52.     The only problem is that it was all based upon a string of lies that started to unravel in 2014.

**D.      The International Council for Clean Transportation/University of West Virginia Study**

53.     In early 2014, the Center for Alternative Fuels, Engines and Emissions ("CAFEE") at West Virginia University ("WVU") was contracted by the International Council on Clean Transportation to conduct in-use testing of three light-duty diesel vehicles, using a portable emissions measurement systems ("PEMS") over test routes in the state of California.  These vehicles had all been certified as compliant with EPA Tier 2-Bin 5 and CARB LEV-II ULEV emission standards.  In addition, two of the three vehicles were also selected for chassis dynamometer testing at CARB's El Monte, Facility.  Gaseous emissions of nitrogen oxides, carbon monoxide, THC, and carbon dioxide were measured using the PEMS.

54.     Two of the test vehicles were a 2012 Volkswagen Jetta and a 2013 Volkswagen Passat equipped with a 2.0L TDI Clean Diesel engine, one with a Lean-NOx trap system and the other with a urea-based Selective Catalytic Reduction ("SCR") system.

55.     Based on their testing, the real world NOx emissions of the two Volkswagen vehicles were found to exceed the EPA Tier 2-Bin 5 standard by factors of 15 to 35 and 5

-19-

to 20, respectively.  However, the NOx emissions for these same two vehicles were below the EPA Tier 2-Bin 5 standard during the chassis dynamometer testing.

**E.      The EPA and CARB Investigations**

56.      The EPA and CARB were alerted to the emissions problems with the Volkswagen test vehicle when WVU CAFEE published the results of its study on May 15, 2014.  Both the EPA and CARB then opened investigations and begin discussions with Defendant Volkswagen Group of America to determine the reason for the high NOx emissions measured under real world driving conditions in the WVU study.

57.      Over the course of the year following the publication of the WVU study, Defendant VW Group of America initiated testing to replicate the WVU testing and identify the technical reasons for the high on-road emissions.  During this time, Defendant continued to assert to CARB and the EPA that the increased emissions from these vehicles could be attributed to various technical issues and unexpected in-use conditions.

58.      In December 2014, Defendant VW Group of America shared the results of its investigation with EPA and CARB and announced that it would conduct a voluntary software recall to recalibrate both the Lean-NOx Trap and the SCR systems.  VW Group of America asserted that the recall would include approximately 500,000 vehicles (approximately 50,000 of which were in California) and would fix, among other things, the real world driving emissions.

59.      Both the EPA and CARB agreed that VW Group of America could implement this recall, but cautioned that they would perform confirmatory testing to ensure that the recall adequately addressed the issue.

60.      CARB, in coordination with the EPA, began confirmatory testing to determine the efficacy of the recall, including both in the laboratory on required certification cycles and over-the-road using PEMS.  The over-the-road testing revealed the recall calibration did reduce emissions to some degree, but that NOx emissions were still significantly higher than expected.

Class Action Complaint
Case No.:

61.     CARB then broadened its testing to pinpoint the exact technical nature of the test vehicles' poor performances, and to investigate why the onboard diagnostic system was not detecting the increased emissions.  To do this, CARB developed a special dynamometer cycle consisting of driving the phase 2 portion of the FTP repeatedly.  This special cycle revealed that NOx emissions would rise throughout the cycle, resulting in uncontrolled NOx emissions.

62.     CARB shared its findings with the EPA and VW Group of America on July 8, 2015, and conducted several technical meetings with VW Group of America.  The EPA and CARB concluded that none of the potential technical issues suggested by VW Group of America explained the higher test results consistently confirmed during CARB's testing.

**F.     VW Group of America's Stunning Admission**

63.     Given the results of CARB's post-recall confirmatory testing and Defendant Volkswagen Group of America's inability to explain why it's TDI Clean Diesel engines were emitting nitrogen oxides in excess of the EPA's Tier 2-Bin 5 and CARB's LEV-II standards, the EPA and CARB made it clear that they would not approve certificates of conformity for Defendants' 2016 model year diesel vehicles until VW Group of America could adequately explain the anomalous emissions and ensure the agencies that the 2016 model year vehicle would not have similar issues.

64.     Only when confronted with the threat that Defendants' 2016 model year diesel vehicles would not be issued certificates of conformity, did VW Group of America admit to EPA and CARB officials that from 2009 through 2015 it had designed, manufactured, and installed a defeat device for the purpose of bypassing, defeating, or rendering inoperative elements of its diesel vehicles' emission control system.

65.     Specifically, this defeat device was a software algorithm installed in the engine control module (ECM) that was designed to sense when the vehicle was being tested for compliance with EPA emissions standards, based on various inputs, including the position of the steering wheel, vehicle speed, the duration of the engine's operation,

-21-

and barometric pressure.  These inputs directly tracked the federal test procedure used for emission testing for EPA certification purposes.

66.     When the software algorithm detected that EPA emission testing was being conducted, the ECM ran software which produced compliant emission results under an ECM calibration that Defendants refer to as the "dyno calibration."  The term "dyno" refers to the equipment used in EPA emissions testing called a dynamometer.  At all other times during normal vehicle operation, the software algorithm an ECM calibration that Defendants referred to as "road calibration" which reduced the effectiveness of the emission control system, specifically the Gen 1, Gen 2, and Gen 3 NOx converter technologies.  As a result, emissions of NOx increased by a factor of 10 to 40 times above the EPA and CARB compliant levels, under real-world operating conditions.

67.     The Clean Air act makes it illegal "for any person to manufacture or sell, or offer to sell, or install, any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter."  42 U.S.C. § 7522(A)(3)(B); 40 C.F.R. § 86.1854-12(a)(3)(ii).

68.     Based on information and belief, Plaintiff alleges that Defendants knowingly and willfully installed a defeat device in the Class Vehicles in order to be able to market and sell such vehicles as having greater fuel efficiency and/or performance than would be possible if the Class Vehicles complied with EPA and CARB standards.

69.     Based on information and belief, Plaintiff alleges that Defendants knowingly and willfully sold the Class Vehicles knowing such vehicles did not comply with EPA and CARB emissions regulations and that if such vehicles were designed and manufactured to comply with such emissions regulations, they would not have the fuel efficiency and performance characteristics that Defendants marketed and represented them to have.

70.     As a result of their investigations and VW Group of America's admissions, both the EPA and CARB issued Notices of Violation to VW Group of America finding that it violated "42 U.S.C. § 7522(a)(1), each time it sold, offered for sale, introduced into commerce, delivered for introduction into commerce, or imported (or caused any of the foregoing with respect to) one of the hundreds of thousands of new motor vehicles within [the designated] test groups."  Additionally, they found VW Group of America to have violated 42 U.S.C. § 7522(a)(3)(B) each time it manufactured and installed into these vehicles an ECM equipped with a defeat device.

71.     The Notices of Violation applied to the following vehicles equipped with the 2.0L TDI clean diesel engine (hereinafter referred to as the "Class Vehicles"):

| Model Year | Make and Model(s) |
|------------|-------------------|
| 2009 | VW Jetta, VW Jetta Sportwagen |
| 2010 | VW Jetta, VW Jetta Sportwagen |
| 2011 | VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3 |
| 2012 | VW Beetle, VW Beetle Convertible, VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3, VW Passat |
| 2013 | VW Beetle, VW Beetle Convertible, VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3, VW Passat |
| 2014 | VW Beetle, VW Beetle Convertible, VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3, VW Passat |
| 2015 | VW Beetle, VW Beetle Convertible, VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3, VW Passat |

**G.     Plaintiff's Lease of a 2013 Jetta 2.0L TDI Clean Diesel**

72.     Plaintiff Todd Mitsuda leased a new 2013 Jetta TDI on or about November 30, 2013, at Moss Bros. VW of Moreno Valley, in Moreno Valley, California.  As part of his decision to make this purchase, Plaintiff was shown marketing materials touting the TDI clean diesel engine.   Included in the purchase price of the vehicle as listed by the Monroney Sticker, was "**2.0L, 140 horsepower, 236 lbs-ft torque inline 4cyl TDI® clean diesel engine.**"

Class Action Complaint
Case No.:

73.     Also included on the Monroney sticker was a representation that the vehicle had a fuel economy rating of 30 MPG city, 42 MPG highway, and 34 MPG combined city/hwy.  Furthermore, the Monroney sticker also represented that the vehicle had Fuel Economy and Greenhouse Gas Rating of 9, a $CO_2$ rating of 8, and smog rating of 5.

74.     Based on these representations, Plaintiff reasonably understood that the 2013 Jetta TDI clean diesel complied with federal clean air standards and possessed the performance, fuel efficiency, and emissions characteristics advertised.

75.     Moreover, in the Warranty and Maintenance Booklet included with the 2013 VW Jetta TDI, Defendants expressly stated:

> "A clean environment is of concern to all of us.  Volkswagen
> has built into your vehicle an efficient emission control system,
> using Genuine Volkswagen parts, **in conformance with the**
> **Federal Clean Air Act in the United States.**"

(Emphasis added.)

76.     Plaintiff conducted extensive research prior to making his decision to lease the 2013 Jetta TDI clean diesel.  Plaintiff became very educated on the TDI clean diesel and observed numerous advertisements, marketing brochures and website pages, car magazine articles, and dealer statements touting the TDI clean diesel as having great performance and fuel efficiency with the impressive vehicle specifications represented, while also being one of the most environmentally clean vehicles available in the market. These were three of the most significant factors in Plaintiff making his decision to lease the 2013 Jetta TDI clean diesel.

77.     At no time prior to or after Plaintiff's lease of the 2013 VW Jetta TDI clean diesel did Defendants inform Plaintiff that his vehicle had been designed and manufactured with a defeat device that caused the vehicle to emit up to 40 times the quantity of nitrogen oxides allowed by federal clean air standards when operated under normal driving conditions.

-24-

Class Action Complaint
Case No.:

78.     At no time prior to or after Plaintiff's lease of the 2013 VW Jetta TDI clean diesel did Defendants inform Plaintiff that his vehicle would not possess performance and/or fuel efficiency characteristics it was represented to have if it were to comply with federal clean air standards.

79.     If he had been informed that the 2013 Jetta TDI clean diesel was equipped with a defeat device that caused it to emit up to 40 times the amount of nitrogen oxides permitted by the federal clean air standards, he would not have leased this vehicle or would not have paid the amount he did for it.

**H.     Defendants' Express Warranties**

80.     In connection with the sale (by purchase or lease) of each one of its new vehicles, Defendants provide an express New Vehicle Limited Warranty on each vehicle for a period of 3 years or 36,000 miles, whichever occurs first.  The NVLW "covers any repair to correct a manufacturing defect in materials or workmanship."

81.     In addition, Defendants expressly warranted its vehicles through a Federal Emissions Control System Defect Warranty in which Defendants warranted for a period of 2 years or 24,000 miles to "every purchaser or lessee":

> that every **model year 2013** Volkswagen vehicle imported by
> Volkswagen:
>
> - was designed, built and equipped so as to conform at the
>   time of sale with all applicable regulations of the United
>   States Environmental Protection Agency (EPA), and
> - is free from defects in material and workmanship which
>   causes the vehicle to fail to conform with EPA
>   regulations . . .

82.     Defendants also expressly warranted for a period of 8 years or 80,000, whichever occurs first, that a Volkswagen dealer will repair or replace free of charge the following major emission control components only:

> - Catalytic Converter and Particulate Filter

Class Action Complaint
Case No.:

- Engine Electronic Control Module
- On Board Diagnostic Device

83.     Defendants also provided a Federal Emissions Performance Warranty that provides that:

> if the following conditions are met, any authorized Volkswagen dealer in the United States, including its territories, will remedy any nonconformity, as determined below, free of charge, under the following circumstances:
>
> - The vehicle fails to conform to at any time during 24 months or 24,000 miles, whichever occurs first, to applicable emission inspection standards as determined by an EPA Approved State Inspection and Maintenance test or inspection, or
> - if the vehicle has been in use for more than 24 months or 24,000 miles, whichever occurs first, the vehicle fails an Inspection and Maintenance test or inspection resulting from a malfunction of a catalytic converter, particulate filter, engine electronic control module or on board diagnostic device (OBD), and
> - the failure of the Inspection and Maintenance test of inspection requires the vehicle owner to bear any penalty or other sanction, including the denial of the right to use the vehicle under local, state, or federal law . . . .

84.     Based on information and belief, Plaintiff further alleges that the relevant terms of the warranties in this case are identical, regardless of the model year of the Class Vehicles.

85.     Plaintiff was provided with a warranty and it was a basis of his lease of the 2013 VW Jetta TDI clean diesel.

Class Action Complaint
Case No.:

86.     Plaintiff and the Class Members experienced defects within the warranty period.  However, despite the existence of the express warranties provided to Plaintiff and Class Members, Defendants failed to inform Plaintiff and the Class Members that the Class Vehicles had been intentionally and knowingly designed and manufactured to be out of compliance with all applicable federal and state clean air standards and by failing to fix the defective emissions components free of charge.

## V

## TOLLING OF THE STATUTE OF LIMITATIONS

87.     Any applicable statute of limitation has been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein.  Plaintiff and proposed class members could not have reasonably discovered the true, defective nature of the proposed Class Vehicles until shortly before this litigation commenced. Defendants are further estopped from relying on any statute of limitation because of their concealment of the defective nature of the Class Vehicles and their engines.

## VI

## CLASS ACTION ALLEGATIONS

88.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of the following class:

> **All persons or entities in the United States who own or lease a Volkswagen or Audi vehicle equipped with a 2.0L TDI Clean Diesel engine (the "Nationwide Class").**

89.     Alternatively, Plaintiff proposes the following state-specific sub-class:

> **All persons or entities who reside in the state of California that own or lease a Volkswagen or Audi vehicle equipped with a 2.0L TDI Clean Diesel engine (the "California Class").**

90.     Excluded from the above class are Defendant, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or

partly own subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case, and all persons within the third degree of relationship to any such persons.

91.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

92.     This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23.

93.     **Numerosity of the Class (Federal Rule of Civil Procedure 23(a)(1))** – The members of the Class are so numerous that their individual joinder is impracticable. Plaintiff is informed and believes that there are hundreds of thousands purchasers in the class.  Inasmuch as the class members may be identified through business records regularly maintained by Defendants and their employees and agents, and through the media, the number and identities of class members can be ascertained.  Members of the Class can be notified of the pending action by e-mail, mail, and supplemented by published notice, if necessary.

94.     **Commonality and Predominance (Federal Rule of Civil Procedure 23(a)(2)** – There are questions of law and fact common to the Class.  These questions predominate over any questions affecting only individual class members.  These common legal and factual issues include, but are not limited to:

      a.  Whether Defendants engaged in the conduct alleged herein;

      b.  Whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

      c.  Whether Defendants designed, manufactured, marketed, distributed, leased, sold or otherwise placed Class Vehicles into the stream of

commerce in the United States knowing that the Class Vehicles did not comply with applicable federal and state emissions standards;

d.  Whether Defendants designed and manufactured the Class Vehicles with a defeat device;

e.  Whether Defendants designed and manufactured the Class Vehicles with a defeat device for the purpose of circumventing federal and state emissions requirements in order to represent that the Class Vehicles had greater performance and fuel economy characteristics than could otherwise have been achieved if in compliance with such emissions standards;

f.  Whether Defendants knew or should have known that the defeat device violated the Clean Air Act;

g.  Whether Defendants intentionally concealed from consumers that the Class Vehicles did not comply with federal and state emissions standards;

h.  Whether Defendants misrepresented to purchasers and lessees of the Class Vehicles that such vehicles were in compliance with federal and state emissions standards;

i.  Whether Defendants breached the express terms of its contracts with purchasers and lessees when it included a defeat device in the ECM of the Class Vehicles;

j.  Whether Defendants breached the covenant of good faith and fair dealing by including a defeat device in the ECM of the Class Vehicles;

k.  Whether Defendants willfully concealed from purchasers and lessees of the Class Vehicles that it designed and manufactured an illegal defeat device in the Class Vehicles;

l.  Whether Defendants engaged in unfair, unlawful and/or fraudulent business practices under California's Unfair Competition Law ("UCL"), California Business and Professions Code §§ 17200, *et seq.*, by designing

Class Action Complaint
Case No.:

and manufacturing a defeat device that rendered the Class Vehicles out of compliance with state and federal emissions standards and the Clean Air Act and representing to consumers that the Class Vehicles were "Clean Diesel" on the window stickers and in their advertisements at and before the time of sale;

m.  Whether the same conduct violated California's Consumer Legal Remedies Act ("CLRA"), California Civil Code §§ 1750, *et seq.*;

n.  Whether Defendant's unlawful, unfair and/or deceptive practices harmed Plaintiff and the members of the Class;

o.  Whether Plaintiff and the other Class members overpaid for their Class Vehicles as a result of the defects alleged herein;

p.  Whether Plaintiff and the other Class members have been harmed by a diminution in value as a result of the defects alleged herein;

q.  Whether Defendants were unjustly enriched by their deceptive practices;

r.  Whether Plaintiff and members of the class are entitled to equitable or injunctive relief and, if so, in what amount.

95.     **Typicality (Federal Rule of Civil Procedure 23(a)(3))** – The claims of the representative Plaintiff are typical of the claims of each member of the Class. Plaintiff, like all other members of the Class, has sustained damages arising from Defendants' violations of the laws, as alleged herein. The representative Plaintiff and the members of the Class were and are similarly or identically harmed by the same unlawful, deceptive, unfair, systematic, and pervasive pattern of misconduct engaged in by Defendants.

96.     **Adequacy (Federal Rule of Civil Procedure 23(a)(4))** – The representative Plaintiff will fairly and adequately represent and protect the interests of the Class members and has retained counsel who are experienced and competent trial lawyers in complex litigation and class action litigation. There are no material conflicts between the claims of the representative Plaintiff and the members of the Class that would make class

certification inappropriate.  Counsel for the Class will vigorously assert the claims of all Class members.

97.   **Superiority (Federal Rule of Civil Procedure 23(b)(3))** – This suit may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3), because questions of law and fact common to the Class predominate over the questions affecting only individual members of the Class and a class action is superior to other available means for the fair and efficient adjudication of this dispute.  The damages suffered by individual class members are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Defendants' conduct.  Further, it would be virtually impossible for the members of the Class to individually redress effectively the wrongs done to them.  Even if Class members themselves could afford such individual litigation, the court system could not.  In addition, individualized litigation increases the delay and expense to all parties and to the court system resulting from complex legal and factual issues of the case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  By contrast, the class action device presents far fewer management difficulties; allows the hearing of claims which might otherwise go unaddressed because of the relative expense of bringing individual lawsuits; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

98.   The Class Plaintiff contemplates the eventual issuance of notice to the proposed Class members setting forth the subject and nature of the instant action.  Upon information and belief, Defendants' own business records and electronic media can be utilized for the contemplated notices.  To the extent that any further notices may be required, the Class Plaintiff would contemplate the use of additional media and/or mailings.

99.   This action is properly maintained as a Class Action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure, in that:

a.  Without class certification and determination of declaratory, injunctive,

statutory and other legal questions within the class format, prosecution of separate actions by individual members of the Class will create the risk of:

        i.    Inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

        ii.    Adjudication with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests;

    b.  The parties opposing the Class have acted or refused to act on grounds generally applicable to each member of the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole; or

    c.  Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a Class Action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

        i.    The interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

        ii.    The extent and nature of any litigation concerning controversy already commenced by or against members of the Class;

        iii.    The desirability or undesirability of concentrating the litigation of the claims in the particular forum;

        iv.    The difficulties likely to be encountered in the management of a Class Action.

## VII

## VIOLATIONS ALLEGED

    100.   Plaintiff alleges the following violations on behalf of the Nationwide Class and all state-specific Classes, except where otherwise specifically noted.

Class Action Complaint
Case No.:

# FIRST CAUSE OF ACTION
## FRAUD BY CONCEALMENT
### (On behalf of the Nation Class or, Alternatively, the California Sub-Class)

101.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

102.   Plaintiff brings this claim on behalf of himself and on behalf of the members of the Nationwide Class or, alternatively, the California Sub-Class.

103.   The misrepresentations, nondisclosure, and/or concealment of material facts made by Defendants to Plaintiff and the members of the Class, as set forth above, were known, or through reasonable care should have been known, by Defendants to be false and material and were intended by Defendants to mislead Plaintiff and the members of the Class.

104.   Defendants had a duty to disclose these safety, quality, functionality, and reliability issues because they consistently marketed their Class Vehicles as possessing certain performance and fuel economy characteristics and as being in compliance with all applicable federal and state emissions standards.  Defendants marketed the Class Vehicles as being "clean diesel."  Once Defendants made representations to the public about safety, quality, functionality, and reliability, as well as about the performance and fuel economy characteristics of the "clean diesel" vehicles in particular, Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated.  One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

105.   In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants which had superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiff and the other Class Members.  These concealed and

Class Action Complaint
Case No.:

omitted facts were material because they directly impact the safety, quality, functionality, reliability, and value of the Class Vehicles.

106.   Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and the other Class Members to purchase or lease Class Vehicles at a higher price for the Class Vehicles, which did not match the Class Vehicles' true value.

107.   Plaintiff and the Class Members were unaware of these omitted material facts that were actively concealed and/or suppressed, in whole or in part, by Defendants with the intent to induce Plaintiff and the other Class Members to purchase or lease the Class Vehicles at a higher price for the Class Vehicles, which did not match the Class Vehicles' true value.

108.   If Plaintiff and other Class Members had known these material facts, they would not have acted as they did.  Plaintiff's and the other Class Members' actions were justified.  Defendants were in exclusive control of the material facts and such facts were not known to the public, Plaintiff, or the Class Members.

109.   As a result of the conduct of Defendants, Plaintiff and the Class Members have been damaged because the value of Plaintiff's and the Class Members' Class Vehicles have diminished as a result of Defendants' fraudulent concealment of its scheme to circumvent federal and state emissions standards, which has harmed the Volkswagen and Audi brand names associated with the Class Vehicles.

110.   Furthermore, based on information and belief, Plaintiff anticipates that if and when Defendants are compelled to bring the Class Vehicles into compliance with state and federal emissions standards, as indicated by the Notices of Violations issued by the EPA and CARB, the Class Vehicles will no longer possess the performance and/or fuel economy characteristics they were represented to possess at the time of sale or lease.

111.   Accordingly, Defendants are liable to Plaintiff and the Class Members for damages in an amount to be proven at trial.

Class Action Complaint
Case No.:

112.   In addition to such damages, Plaintiff seeks punitive or exemplary damages pursuant to California Civil Code § 3294 in that Defendants engaged in "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant[s] with the intention on the part of the defendant[s] of thereby depriving a person of property or legal rights or otherwise causing injury."

113.   Defendants wantonly, maliciously, oppressively deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class Members' rights engaged in a systematic and intentional scheme to defraud consumers and state and federal regulators by circumventing the laws of the United States, state of California, and other states, by designing a defeat device in the form of a software algorithm whose sole purpose was to make it appear that the Class Vehicles complied with federal and state emissions standards when, in fact, they exceeded such standards by as much as 40 times.  In perpetrating this scheme, Defendants were able to secure a 78% share of the automotive diesel market in the United States by representing their "clean diesel" vehicles to have performance and fuel economy characteristics that would not be possible if the Class Vehicles complied with federal and state emissions standards, not to mention taking market share away from cleaner burning hybrid and gasoline combustion cars by this fraud.

114.   Based on information and belief, Plaintiff alleges that Defendants engaged in a course of conduct to ensure that employees, dealers, and agents did not reveal this scheme to regulators or consumers in order to facilitate its fraudulent scheme and enhance Defendants' reputation and that of the Class Vehicles in order to sell more vehicles and to sell those vehicles at an inflated price.

115.   Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

//

//

Class Action Complaint
Case No.:

## SECOND CAUSE OF ACTION
## VIOLATION OF MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301, *et seq.*)

### (On behalf of the Nation Class or, Alternatively, the California Sub-Class)

116.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

117.   Plaintiff brings this claim on behalf of himself and on behalf of the members of the Nationwide Class or, alternatively, the California Sub-Class.

118.   Plaintiff and the Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

119.   Defendants are "suppliers" and "warrantors" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

120.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

121.   Title 15, United States Code, section 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

122.   Defendants' express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).  The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

123.   Defendants breached these warranties as described in more detail above. The Class Vehicles are equipped with the 2.0L TDI clean diesel engine.  The Class Vehicles share a common defect in that they were designed and manufactured with a defeat device such that they are not in compliance with the Clean Air Act and cannot meet state and federal emissions standards under normal driving conditions.

124.   Plaintiff and the other Class Members have had sufficient direct dealings with either Defendants or their agents (dealerships and technical support) to establish privity of contract between Defendants, on one hand, and Plaintiff and each of the other

-36-

Class Members on the other hand.  Nonetheless, privity is not required here because Plaintiff and each of the other Class Members are intended third-party beneficiaries of contracts between Defendants' and its dealers, and specifically, of Defendants' express and implied warranties.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

125.   Affording Defendants a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.  Defendants have engaged in a more than 7-year endeavor to knowingly conceal the fact that is designed and manufactured into the Class Vehicles a defeat device for the sole purpose of circumventing state and federal emissions standards.  At the time of sale or lease of each Class Vehicle, Defendants knew, should have known, or were reckless in not knowing of its misrepresentations and omissions concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defect.  Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff resort to an informal dispute resolution procedure and/or afford Defendants a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

126.   Plaintiff and the other Class Members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them.  Because Defendants are refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiff and the other Class members have not re-accepted their Class Vehicles by retaining them.

127.   The amount in controversy of Plaintiff's individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

128.   Plaintiff, individually and on behalf of the other Class members, seeks all damages permitted by law, including diminution in value of the Class Vehicles, in an amount to be proven at trial.

### THIRD CAUSE OF ACTION

### VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW

#### (California Business & Professions Code §§ 17200, *et seq.*)

#### (On Behalf of the California Sub-Class)

129.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

130.   Plaintiff brings this claim on behalf of himself and on behalf of the members of the California Sub-Class.

131.   California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, defines unfair business competition to include any "unfair," "unlawful," or "fraudulent" business act or practice.  The Act also provides for injunctive relief, restitution, and disgorgement of profits for violations.

132.   Defendants' unlawful, unfair, and fraudulent business acts and practices, as described throughout this FAC, was and is in violation of the UCL.  Defendants' conduct violates the UCL in the following ways:

> i.   By knowingly and intentionally concealing from Plaintiff and the other Class Members that the Class Vehicles were designed and manufactured with a defeat device that rendered the Class Vehicles out of compliance with federal and state law and emissions standards while obtaining money from Plaintiff and the Class Members;
>
> ii.  By marketing the Class Vehicles as being "clean diesel" and complying with federal and state emissions standards;

iii. By violating federal laws, including the Clean Air Act, 42 U.S.C. §§ 7522(a)(1), 7522(a)(3)(B), 7524(a), and 40 C.F.R. § 19.4; and the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301; and

iv. By violating other California laws, including California Civil Code §§ 1709, 1710, 1791.1, 1791.2, 1792, and 1750, *et seq*., and California Commercial Code § 2314.

133. Defendants' misrepresentations and omissions alleged herein caused Plaintiff and the other Class Members to make their purchases or leases of their Class Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other Class members would not have purchased or leased these Vehicles, would not have purchased or leased these Class Vehicles at the prices they paid, and/or would have purchased or leased alternative vehicles that complied with federal and state emissions standards.

134. Defendants' practice is also unfair since it has no utility and, even if it did, any utility is outweighed by the gravity of harm to Plaintiff and the Class Members. Defendants' practice is also immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweigh its benefits.

135. Accordingly, Plaintiff and the Class Members have suffered injury in fact, including lost money or property as a result of Defendants' actions, misrepresentations, and omissions.

136. Plaintiff seeks to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants, under California Business and Professions Code § 17200.

137. Plaintiff requests that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiff and members of the Class any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in California Business and Professions Code § 17203 and California Civil Code § 3345; and for such other relief set forth below.

//

## FOURTH CAUSE OF ACTION
## VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW
### (California Business & Professions Code §§ 17500, *et seq.*)
### (On Behalf of the California Sub-Class)

138.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

139.   Plaintiff brings this claim on behalf of himself and on behalf of the members of the California Sub-Class.

140.   California Bus. & Prof. Code § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

141.   Defendants caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, including statements on the vehicle Monroney sticker and in nationally distributed print and video advertisements that the Class Vehicles were "clean diesel."  Defendants also caused to be made or disseminated through California and the United States, through its USA Warranty and Maintenance booklet, the misrepresentation that the Class Vehicles were "designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA), and [are] free from defects in material and workmanship which causes the vehicle(s) to fail to conform with EPA regulations."  These statements were known, or which by the exercise of reasonable care should have been known, to Defendants to be untrue and misleading to consumers, including Plaintiff and the other Class Members.

142.   Defendants have violated section 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of their Class Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

143.   Plaintiff and the other Class Members have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful, and/or deceptive practices.  In purchasing or leasing their Class Vehicles, Plaintiff and the other Class Members relied on the misrepresentations and/or omissions of Defendants with respect to the safety, reliability, and performance and fuel economy characteristics of the Class Vehicles.  Defendants' representations were not to be true because the Class Vehicles were designed, manufactured, and distributed with a defeat device, the sole purpose of which was to circumvent federal and state emissions standards.  Had Plaintiff and the other Class Members known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them. Accordingly, Plaintiff and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

144.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business.  Defendant's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of California and nationwide.

145.   Plaintiff, individually and on behalf of the other Class Members, request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiff and the other Class Members any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

//

//

//

Class Action Complaint
Case No.:

# FIFTH CAUSE OF ACTION
## VIOLATION OF CALIFORNIA CONSUMER LEGAL REMEDIES ACT
### (Civil Code § 1750 *et seq.*)
### (On Behalf of the California Sub-Class)

146.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

147.   Plaintiff brings this claim on behalf of himself and on behalf of the members of the California Sub-Class.

148.   California's Consumers Legal Remedies Act ("CLRA"), California Civil Code §§ 1750, *et seq.*, proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

149.   The Class Vehicles are "goods" as defined in California Civil Code § 1761(a).

150.   Plaintiff and the other Class Members are "consumers" as defined in California Civil Code § 1761(d), and Plaintiff, the other Class Members, and Defendants are "persons" as defined in California Civil Code § 1761(c).

151.   Plaintiff's and each and every Class Members' purchase or lease of the subject vehicle constitute a "transaction" as defined by California Civil Code § 1761(e).

152.   As alleged above, Defendants made numerous representations concerning the benefits and safety features of the Class Vehicles that were misleading.

153.   The acts and practices of Defendants as discussed throughout the Complaint, constitute "unfair or deceptive acts or practices" by Defendants, that are unlawful, as enumerated in section 1770(a) of the California Civil Code, specifically in at least the following CLRA provisions:

> i.   Cal. Civ. Code § 1770(a)(5): Representing that goods have characteristics, uses, and benefits which they do not have;

ii. Cal. Civ. Code § 1770(a)(7): Representing that goods are of a particular standard, quality, or grade, if they are of another;

iii. Cal. Civ. Code § 1770(a)(9): Advertising goods with intent not to sell them as advertised; and

iv. Cal. Civ. Code § 1770(a)(16): Representing that goods have been supplied in accordance with a previous representation when they have not.

154.   Plaintiff and the other Class Members have suffered injury in fact and actual damages resulting from Defendants' material omissions and misrepresentations because they paid an inflated purchase or lease price for the Class Vehicles.

155.   Defendants knew, should have known, or were reckless in not knowing that the Class Vehicles were designed, manufactured, distributed with a defeat device, the sole purpose of which was to circumvent federal and state emissions standards and, as such, were not were not suitable for their intended use.

156.   The facts concealed and omitted by Defendants to Plaintiff and the other Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay a lower price.  Had Plaintiff and the other Class members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would not have paid the prices they, in fact, paid.

157.   Such misconduct materially affected the purchasing decisions of Plaintiff and the Class Members.

158.   Plaintiff's and the other California Class Members' injuries were proximately caused by Defendants' fraudulent and deceptive business practices.

159.   Plaintiff seeks injunctive relief pursuant to California Civil Code § 1780.

160.   Plaintiff has provided Defendants with notice of his alleged violations of the CLRA pursuant to California Civil Code § 1782(a).  If, within 30 days of the date of this written notice, Defendants fail to provide appropriate relief for their violation of the

CLRA, Plaintiff will amend this Complaint to seek monetary, compensatory, and punitive damages, in addition to the injunctive relief now being sought, under the CLRA.

## SIXTH CAUSE OF ACTION

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (California Commercial Code § 2314)

### (On Behalf of the California Sub-Class)

161.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

162.   Plaintiff brings this claim on behalf of himself and on behalf of the members of the California Sub-Class.

163.   Defendants are and were at all relevant times merchants with respect to motor vehicles under California Commercial Code § 2104.

164.   A warranty that the Class Vehicles were in merchantable condition was implied by law in the instant transaction, pursuant to Cal. Com. Code § 2314.

165.   These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles were defective in that they were equipped with a defeat device, the sole purpose of which was to circumvent federal and state emissions standards.

166.   Defendants were fully aware of this issue, as evidenced by the fact that on September 3, 2015, it admitted to EPA and CARB officials the existence of the defeat device when threatened with the withholding of Certificates of Conformity for its 2016 model year diesel vehicles.

167.   Plaintiff and the other Class members have had sufficient direct dealings with either Defendants or its agents (dealerships) to establish privity of contract between Plaintiff and the other Class Members.  Notwithstanding this, privity is not required in this case because Plaintiff and the other Class Members are intended third-party beneficiaries of contracts between Defendants and its dealers; specifically, they are the

intended beneficiaries of Defendants' implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.  Finally, privity is also not required because Plaintiff's and the other Class Members' Class Vehicles are dangerous instrumentalities due to the aforementioned defects.

168.   As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiff and the other Class Members have been damaged in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION
## BREACH OF CONTRACT/COMMON LAW WARRANTY
### (On Behalf of the California Sub-Class)

169.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

170.   Plaintiff brings this claim on behalf of himself and on behalf of the members of the California Sub-Class.

171.   To the extent Defendants' limited remedies are deemed not to be warranties under California's Commercial Code, Plaintiff, individually and on behalf of the other Class Members, pleads in the alternative under common law warranty and contract law. Defendants limited the remedies available to Plaintiff and the other Class Members to repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Defendants and/or warranted the quality or nature of those services to Plaintiff and the other Class Members.

172.   Defendants breached this warranty or contract obligation by failing to repair or replace the Class Vehicles' defective emissions systems.

173.   The material terms of the contract also included the implied covenant of good faith and fair dealing, whereby Defendants covenanted that they would, in good faith and in the exercise of fair dealing, deal with Plaintiff and each Class Member fairly

and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiff's and the Class Members' rights and benefits under the contract.

174.   Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contract

175.   Defendants breached the contract and the implied covenant of good faith and fair dealing by, inter alia, equipping the Class Vehicles with defective emissions standards that were not in compliance with federal and state emissions standards.

176.   As a direct and proximate result of Defendants' breach of contract or common law warranty, Plaintiff and the other Class Members have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## EIGHTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION
### (On Behalf of the California Sub-Class)

177.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

178.   Plaintiff brings this claim on behalf of himself and on behalf of the members of the California Sub-Class.

179.   Defendants had a duty to provide honest and accurate information to its customers so that customers could make informed decisions regarding the purchase or lease of automobiles.

180.   Defendants specifically and expressly misrepresented material facts to Plaintiff and Class Members, as set forth above, including, but not limited to representations that the Class Vehicles complied with federal and state emissions standards and possessed certain performance and fuel economy characteristics.

181.   Defendants knew, or in the exercise of reasonable diligence should have known, that the ordinary consumer would be misled by these misrepresentations.

182.   Plaintiff and the Class Members justifiably relied on Defendants' misrepresentations and have been damaged thereby.

### NINTH CAUSE OF ACTION

### VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF EXPRESS WARRANTIES

#### (California Civil Code §§ 1791.2 and 1973.2(D))

#### (On Behalf of the California Sub-Class)

183.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

184.   Plaintiff brings this claim on behalf of himself and on behalf of the members of the California Sub-Class.

185.   Plaintiff and the other Class Members who purchased or leased the Class Vehicles in California are "buyers" within the meaning of California Civil Code § 1791(b).

186.   The Class Vehicles are "consumer goods" within the meaning of California Civil Code § 1791(a).

187.   Defendants are "manufacturers" of the Class Vehicles within the meaning of California Civil Code § 1791(j).

188.   Plaintiff and the other Class Members purchased/leased new motor vehicles manufactured by Defendants.

189.   Defendants made express warranties to Plaintiff and the other Class Members within the meaning of California Civil Code §§ 1791.2 and 1793.2, as described above.

190.   As set forth above, in the USA Warranty and Maintenance Booklet distributed with each Class Vehicle, Defendants expressly warranted through the New Vehicle Limited Warranty and through Federal Emissions Warranty that they would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period.

191.   As set forth above in detail, the Class Vehicles are inherently defective in that there are defects in the Class Vehicles' emissions system and ECM that render it out of compliance with federal and state emissions standards.  This defect was and continues to be covered by Defendants' express warranties, and these defects substantially impair the use, value, and safety of the Class Vehicles to reasonable consumers like Plaintiff and the other Class members.

192.   Defendants and its authorized repair facilities failed and continue to fail to repair the Class Vehicles to match Defendants' written warranties after a reasonable number of opportunities to do so.

193.   Defendants and its authorized repair facilities refuse and have failed to replace the defective emissions system, even when they represented to federal and state officials that they were doing so.

194.   Defendants did not promptly replace or buy back the Class Vehicles of Plaintiff and the other Class members.

195.   As a result of Defendants' breach of its express warranties, Plaintiff and the other Class Members received goods whose dangerous condition substantially impairs their value to Plaintiff and the other Class Members. Plaintiff and the other Class Members have been damaged as a result of the diminished value of the Class Vehicles and/or the failure of the Class Vehicles to possess the performance and/or fuel economy characteristics as advertised.

196.   Pursuant to California Civil Code §§ 1793.2 & 1794, Plaintiff and the other Class Members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

197.   Pursuant to California Civil Code § 1794, Plaintiff and the other Class Members are entitled to costs and attorneys' fees.

//

//

-48-

# TENTH CAUSE OF ACTION

## VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (California Civil Code §§ 1791.1 and 1792)

### (On Behalf of the California Sub-Class)

198.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

199.   Plaintiff brings this claim on behalf of himself and on behalf of the members of the California Sub-Class.

200.   Plaintiff and the other Class members who purchased or leased the Class Vehicles in California are "buyers" within the meaning of California Civil Code § 1791(b).

201.   The Class Vehicles are "consumer goods" within the meaning of California Civil Code § 1791(a).

202.   Defendants are "manufacturers" of the Class Vehicles within the meaning of California Civil Code § 1791(j).

203.   Defendants impliedly warranted to Plaintiff and the other Class members that their Class Vehicles were "merchantable" within the meaning of California Civil Code §§ 1791.1(a) & 1792, however, the Class Vehicles do not have the quality that a buyer would reasonably expect.

204.   California Civil Code § 1791.1(a) states:

"Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1)   Pass without objection in the trade under the contract description.

(2)   Are fit for the ordinary purposes for which such goods are used.

Class Action Complaint
Case No.:

(3)     Are adequately contained, packaged, and labeled.

(4)     Conform to the promises or affirmations of fact made on the container or label.

205.   The Class Vehicles would not pass without objection in the automotive trade because of the defects in the Class Vehicles' emissions system that cause it to be out of compliance with state and federal emissions standards.

206.   Because of the defects in the Class Vehicles' emissions systems, they are not safe to drive and not in compliance with federal and state laws, and thus not fit for ordinary purposes.

207.   The Class Vehicles are not adequately labeled because the labeling fails to disclose the defects in the Class Vehicles' emissions systems.

208.   Defendants breached the implied warranty of merchantability by manufacturing and selling Class Vehicles containing defects associated with the emissions system.  Furthermore, these defects have caused Plaintiff and the other Class Members to not receive the benefit of their bargain and have caused Class Vehicles to depreciate in value.

209.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and the other Class Members received goods whose dangerous and dysfunctional condition substantially impairs their value to Plaintiff and the other Class Members. Plaintiff and the other Class Members have been damaged as a result of the diminished value of Defendants' products and the products' malfunctioning.

210.   Pursuant to California Civil Code §§ 1791.1(d) & 1794, Plaintiff and the other Class Members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

211.   Pursuant to California Civil Code § 1794, Plaintiff and the other Class members are entitled to costs and attorneys' fees.

//

## ELEVENTH CAUSE OF ACTION
## DECEIT
## (California Civil Code § 1710)
## (On Behalf of the California Sub-Class)

212.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

213.   Based on Defendants' conduct as set forth above, Defendants have engaged in fraud and deceit, as set forth in California Civil Code § 1710, in that Defendants represented that the Class Vehicles were in compliance with federal and state emissions standards and possessed certain performance and fuel economy characteristics when, in fact, Defendants knew or should have known that the Class Vehicles were incapable of complying with federal and state emissions standards and, if brought into compliance with such standards, would not possess the performance and fuel economy characteristics as advertised.

214.   Plaintiff and the Class Members have reasonably relied on the material misrepresentations and omissions made by Defendants and have been damaged thereby.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

1.   For an order certifying this action as a class action;

2.   For an order appointing Plaintiff as representative of the Class and his counsel of record as Class counsel;

3.   For an award of actual, general, special, incidental, statutory, compensatory and consequential damages on claims brought under the California Unfair Competition Law and False Advertising Law, breach of express and implied warranties under all relevant statutes, and breach of the covenant of good faith and fair dealing (at this juncture, damages are not being sought under the California

Class Action Complaint
Case No.:

Consumer Legal Remedies Act) and in an amount to be proven at trial;

4.     For an award of exemplary and punitive damages in an amount to be proven at trial;

5.     For an order requiring Defendants to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

6.     For an order enjoining the wrongful conduct alleged herein;

7.     For costs;

8.     For interest;

9.     For attorneys' fees under applicable law, including California Code of Civil Procedure § 1021.5 (at this juncture, attorneys fees are not being sought under the California Consumer Legal Remedies Act);

10.     For such other relief as the Court deems just and proper.

DATED:  September 21, 2015.          **McCuneWright, LLP**

               BY:  *__/s/ Richard D. McCune__*
                      Richard D. McCune
                      Attorney for Plaintiff and the Putative Class

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all claims so triable.

DATED:  September 21, 2015.          **McCuneWright, LLP**

               BY:  *__/s/ Richard D. McCune__*
                      Richard D. McCune
                      Attorney for Plaintiff and the Putative Class

Class Action Complaint
Case No.: